# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

JOSHUA HACKWORTH, individually and )
on behalf of those similarly-situated )
                                                         )
       Plaintiff, )
                                                         )
v. )    Case No.      3:21-cv-114
                                                         )
HARRIMAN UTILITY BOARD, )    **JURY TRIAL DEMANDED**
                                                        )
       Defendant. )

## JOINT MOTION FOR APPROVAL OF SETTLEMENT AGREEMENT

Come Joshua Hackworth and the opt-in plaintiffs in this matter,[1] by and through counsel, and Defendant Harriman Utility Board, by and through counsel, and jointly move the Court for approval of their agreement to settle all of the claims of Plaintiff and the opt-in plaintiffs in this matter. Specifically, the parties' settlement agreement is attached hereto as Exhibit 1. To summarize the agreement, the parties propose, subject to the Court's approval, that the claims of Plaintiff and the opt-in plaintiffs against Defendant in this matter (and a related state court matter) be settled in exchange for Defendant paying $175,000.00, of which $110,000.00 is to be paid to Plaintiff and the six opt-in plaintiffs on account of unpaid overtime compensation and liquidated damages, $10,000.00 is to be paid to Plaintiff Joshua Hackworth as a named plaintiff award, and $55,000.00 is to be paid on account of Plaintiff's attorney's fees and litigation expenses.

---

[1]    Reference is made herein to the "opt-in plaintiffs." This term refers to the six persons who filed consents to join this action and did not voluntarily dismiss their claims prior to the mediation, including Frank Hawn, Jacob Cunningham, Travis Clark, Earnestina Boyd, Jason Lee, and Jeremy Evans. Tracey Bolden joined the action in April, 2021 (Ct. Doc. 8-1), but then voluntarily dismissed her claims ten days later (Ct. Doc. 15); she is not part of the settlement. The six opt-in plaintiffs have each individually signed and approved the settlement agreement, as discussed in more detail in the text.

The parties represent that they have entered into the settlement in an arms-length transaction after Plaintiff engaged counsel who (A) investigated Plaintiff's claims, (B) initiated Plaintiff's claims in this matter, (C) sought and obtained conditional certification of this matter as a collective action under the Fair Labor Standards Act (FLSA), (D) communicated with the opt-in plaintiffs, (E) sought discovery from Defendant to support Plaintiff's claims (including obtaining and performing extensive analysis of every timecard available for Plaintiff and every opt-in plaintiff), and (F) investigated Defendant's asserted defenses (including Defendant's defense that timesheets, and not timecards, recorded the amount of time worked by Defendant's employees).

Thereafter, the parties mediated this matter with mediator Michael Russell (with Plaintiff, Plaintiff's counsel, a representative from Defendant, and Defendant's counsel attending in-person in Brentwood, Tennessee). The mediation resulted in a settlement which was reduced to a formal settlement agreement. Plaintiff and every opt-in Plaintiff have signed the agreement, and Plaintiff's counsel believes the settlement is not only fair, but an excellent resolution for Plaintiff and the opt-in plaintiffs of the settled claims. The parties now ask the Court to approve the settlement.

## PROCEDURAL BACKGROUND OF SETTLEMENT

This matter was filed on March 27, 2021 by Plaintiff. Ct. Doc. 1. Plaintiff asserted that Plaintiff and similarly-situated employees were not paid for all of their work in excess of forty hours per week because Defendant had several policies which Plaintiff contended[2] violated the Fair Labor Standards Act and state law, including policies of (A) accurately recording certain time worked using timeclocks, but paying employees less than the amount recorded, (B) not including

---

[2] This motion contains descriptions of Plaintiff's allegations and positions in this action. Defendant has denied that it deprived wages from or is otherwise liable to Plaintiff, the opt-in plaintiffs, or any other employee. The description of Plaintiff's allegations contained herein is provided to inform the Court of the parties' dispute, and the parties' decision to settle this action, and neither the settlement nor the description of the settlement in this motion should be construed in any way to constitute an admission by Defendant of any liability.

all compensation in calculating the overtime rate of pay, (C) requiring employees to attend a "Hooray for Harriman" community event and meetings of Defendant's board, but not treating the associated time as hours worked, and (D) automatically deducting lunch time, despite employees sometimes not receiving the full amount of lunch. *Id.* Prior to filing the Complaint, Plaintiff had obtained through a Tennessee Public Records Act request timecards for every employee for four pay periods spread over the FLSA statute of limitations period, and Plaintiff attached the timecards to the Complaint to illustrate Plaintiff's allegations regarding Defendant's timekeeping and payroll practices. Ct. Doc. 1-8, 1-9, 1-10 and 1-11.

Defendant filed an Answer on May 10, 2021, denying that Plaintiff or any other employee performed uncompensated overtime work, and further denying that there were any individuals similarly-situated to Plaintiff. Ct. Doc. 16.

The very day[3] Defendant filed its Answer,[4] Plaintiff filed a motion for conditional certification, requesting that the Court approve a notice be sent to Defendant's current and former hourly employees. Ct. Doc. 17. Plaintiff attached to this motion several declarations, including a declaration from a former member of Defendant's management,[5] and a summary spreadsheet that

---

[3]    Plaintiff prepared his motion for conditional certification prior to Defendant's filing of the Answer, but filed the motion the day of the Answer in order to incorporate admissions made by Defendant in the Answer into the motion. See Ct. Doc. 17 at 3 (incorporating reference to Answer's failure to deny that timecards attached to Complaint were authentic); 8, fn 5 (noting similar failure of Answer to deny authenticity of timecard containing handwritten note regarding "docking time" for "all… employees" who were "late"); 14, fn. 14 (noting Answer's failure to deny authenticity of Employee Manual attached by Plaintiff to Complaint).

[4]    Plaintiff objected to certain of Defendant's pleading practices in the initial Answer and, in response, Defendant filed a First Amended Answer. Ct. Doc. 23. Plaintiff viewed these objections to Defendant's pleading practices as worthwhile, as Plaintiff viewed the Amended Answer as responding to and admitting matters which had not been unambiguously addressed in the initial Answer. *Compare, e.g.,* Ct. Doc 16 at ¶ 84 (responding to allegation of ¶ 83 of complaint that Defendant's employees timecards were attached to Complaint by stating that attached documents "speak for themselves") with Ct. Doc. 23 at ¶ 84 (admitting, with reservations, that "it appears from a review of the submitted timecards that they are copies of timecards for various HUB employees performing various jobs during various periods of time").

[5]    Plaintiff's counsel previously represented a former member of Defendant's management, Lisa Ryans, in Ms. Ryans' action in this Court against Defendant. See *Ryans v. Harriman Utility Board*, No 3:18-cv-00195. Ms. Ryans agreed to provide declaration testimony in support of Plaintiff's allegations that Defendant deprived its non-exempt

Plaintiff contended illustrated that the timecards Plaintiff had attached to the Complaint showed that numerous employees had, like Plaintiff, not been paid for the time recorded on the timecards.

Defendant responded, arguing that Plaintiff had not met Plaintiff's burden of establishing that other employees were similarly-situated to Plaintiff. Ct. Doc. 19. Arguing that Plaintiff misunderstood Defendant's employee's activities and/or payroll system, Defendant provided with its response a declaration of its Human Resources Manager, Whitney Helton, stating that there was a "timesheet" in addition to the timecards referenced by Plaintiff and "[t]he purpose of the 'timesheet' is to establish an accurate determination and affirmation by the employee of the amount of the employee's hours actually worked for HUB within that pay period…. The purpose of the use of timecards is to serve as a verification that the particular employee has been able to actually complete the hours worked claim on his/her timesheet for that particular pay period. The timecards do not necessarily reflect actual hours worked by HUB employees." Ct. Doc. 19-1 at 3.

Plaintiff filed a reply, arguing, *inter alia*, that Defendant's timesheet/timecard argument was a premature merits argument that should not be resolved at the conditional certification stage, Ct. Doc. 24 at 5, and that Defendant's argument (that time worked was recorded on the "timesheet," not on the "timecard") was also inconsistent with Defendant's own employee Manual, which provided that "Non-Exempt employees will use Time Cards to record his/her hours worked, including approved hours beyond his/her standard hours. Non-Exempt employees will 'clock in' when he/she report[s] for duty, and 'clock out' when released," Ct. Doc. 24 at 12-13, quoting Ct.

---

employees of overtime compensation, although she herself was an exempt employee. Ct. Doc. 17-1. Along with her personal knowledge, Ms. Ryans' declaration also introduced into the record of this action deposition testimony Defendant's General Manager had provided in the *Ryans* litigation, in which Defendant's General Manager acknowledged that certain employees were "strongly encouraged" to attend meetings of Defendant's board, and as a result "all or almost all" of those employees "would regularly attend every regularly scheduled meeting" without being paid for doing so, although she denied that the employees were "required" to do so. See Ct. Doc 17-1 at 7-8 (Page ID # 566-567).

Doc. 21-2 at 40 (the Employee Manual also referenced "Time Sheets, rather than use of Time Cards," but only for *exempt* employees. *Id*.).

In addition to seeking Court approval of a notice to Defendant's current and former employees, Plaintiff also initiated discovery. Ct. Doc. 20-1. However, Defendant sought a protective order, characterizing the discovery sought as "voluminous and involved." Ct. Doc. 20. Plaintiff opposed any stay. Ct. Doc. 24.

The Magistrate Judge ruled that discovery would be stayed until after the Court ruled on Plaintiff's motion for notice, and, if it granted that motion, until 30 days after the notice period. Ct. Doc. 34. The ruling indicated the concern that "avoiding… piecemeal discovery will conserve the time and expense of the parties and avoid duplicative discovery effort." *Id*. at 10.

Thereafter, Plaintiff filed a motion for leave to voluntarily dismiss Plaintiff's state law claims "so that Plaintiff may file these claims in Tennessee state court." Ct. Doc. 35. Defendant responded that it took no position on this motion. Ct. Doc. 36. The Court granted the motion, Ct. Doc. 37, and Plaintiff promptly thereafter re-filed his state law claims in Roane County Circuit Court[6] as a proposed Tennessee Rule of Civil Procedure 23 class action on behalf of all of Defendant's hourly employees.

The Court thereafter granted Plaintiff's notice motion. Pursuant to the Court's Order, notice was sent to all of Defendant's current and former employees. As a result, in addition to the four opt-in plaintiffs (beyond Plaintiff Hackworth) who had already joined the action, two additional opt-in plaintiffs joined the action following the notice.

---

[6] Plaintiff sought discovery in the state court action. Defendant filed a motion for a protective order in the state court relating to this discovery, but, because the parties were able to reach an agreement regarding an exchange of documents in advance of the anticipated mediation, a hearing was not set on the motion.

## COURSE OF SETTLEMENT DISCUSSIONS

Counsel for the parties discussed relatively early in this action a procedure to try to move the case towards a potential settlement resolution. Specifically, Defendant indicated it was willing to mediate the matter, but wanted to do so after the Court had ruled on the notice motion (which was at that time not adjudicated) so that the identity of the persons who would join this action would be known.

Defendant recognized that Plaintiffs would need documents from Defendant in order to prepare for an informed mediation, and therefore, despite the stay of discovery in this action, produced hundreds of pages of timecards, timesheets, and payroll information to Plaintiff.

Counsel agreed that, in order to assess Plaintiff's claims under Plaintiff's theory relating to the employees' timecards, the data from the timecards, which only existed in paper, non-electronic format, would need to be inputted and reviewed. Accordingly, counsel agreed to a procedure by which Defendant's counsel's office would input the times clearly shown under the "In" and "Out" columns of each timecard into a Microsoft Excel spreadsheet.

After this was conveyed to Plaintiff's counsel, Plaintiff's counsel's assistant, under Plaintiff's counsel's supervision, inputted further information from the timecards in the spreadsheet, including (A) the number of hours paid as regular hours, "overtime" hours (i.e., at a 1.5 times base pay rate), double-time hours, and "standby" hours in the pay period, (B) the allocation of workdays shown on the timecard to one or the other of the two workweeks reflected on each timecard, and (C) the adjustment of imputed lunch period times when the timecard reflected on its face that the employee did not have a lunch (or had a partial lunch period). Plaintiff's counsel's assistant also inputted employee base hourly rates of pay (as in effect over time, as employees' base pay rates periodically increased).

Plaintiff's counsel further performed extensive further analysis of the timecard data, including the determination of start and stop times in circumstances under which the timecard (as it did on numerous occasions) stamped entries over another entry, or in which entries were otherwise missing but the amount of time worked could be detected from other indicia on the timecard. Plaintiff's counsel also ensured the correct treatment in the spreadsheet being developed of unusual circumstances, such as entries relating to storms, during which employees (who are utility workers who have to get electricity running again after storms) sometimes remained "clocked in" for several days.

This thorough-yet-painstaking process allowed the computation of the exact (as best as could be determined from the timecards) amount of time that elapsed between the "In" and "Out" entry every day for every employee who joined this action, from the date six years prior to the initiation of this action (the statute of limitations under Plaintiff's state law theory) through the present. That computation could then, through a series of complex formulas, calculate four separate types of pay which Plaintiff contended Defendant improperly failed to pay.

Specifically, the formulas ultimately developed allowed the computation for every employee and every day worked (1) the amount (and dollar value) of hours worked in excess of 40 hours in the workweek that were not paid at or above an overtime rate of pay, (2) the amount/value of hours which were not in excess of 40 hours in the workweek, but which were in excess of 8 hours in the workday,[7] and which were not paid at a premium rate (after premium payments were first applied to Defendant's overtime obligations), (3) the amount/value of non-overtime, non-premium hours shown by the timecards that were not paid by Defendant, and (4)

---

[7] Although not required by law to do so, Defendant has maintained a policy of paying employees one and one-half their base hourly rate for hours worked in excess of eight in the workday, even if those hours are not hours worked in excess of forty in the workweek.

the amount of additional overtime which would have been owed if Defendant had incorporated "standby" compensation in calculating overtime rates of pay. Counsel for Plaintiff shared Counsel for Plaintiff's spreadsheet analysis as to Plaintiff Hackworth and one other opt-in with counsel for Defendant in advance of the mediation in order to ensure that all parties would be "on the same page" about what the timecard analysis showed, and what analysis Plaintiff considered appropriate.[8]

The parties participated in an in-person mediation at the office of mediator Michael Russell in Brentwood, Tennessee, which lasted most of the day on December 6, 2022. Plaintiff Hackworth, who had been authorized by all of the other opt-in plaintiffs to make decisions relating to the FLSA claims in this action, attended the mediation in person, as did counsel. During the mediation, the parties shared their calculations, and discussed extensively the issues in both this action and the related state-law class action.

At the conclusion of the mediation, the parties reached an agreement. The parties agreed that Defendant would pay $110,000.00 to Plaintiff and the six opt-ins. This amount was to be divided based on an equitable formula to be developed by Plaintiff's counsel. Plaintiff's counsel thereafter ensured the spreadsheet analysis described above was complete, then divided the $110,000.00 amongst Plaintiff and the opt-in plaintiffs based on a 50% weighting of the amount each employee would have received under Plaintiff's counsel analysis of the timecards, and a 50% weighting of the amount each employee would have received under Defendant's analysis, as shared at mediation.

---

[8] In addition to Plaintiff's counsel's spreadsheet-based analysis, counsel for Defendant performed Defendant's own analysis of the timecard data. This was shared with Plaintiff during the mediation, and, as discussed further in the text, Plaintiff included this analysis in calculating Plaintiff's equitable division of the settlement proceeds.

This resulted in the plaintiffs receiving different amounts from the settlement, depending on the amount of unpaid time shown on his or her timecards. The amounts varied from as low as $1,162.16 for opt-in plaintiff Jeremy Evans (an employee who worked for Defendant for less than a year) to as much as $37,081.72 for opt-in plaintiff Jacob Cunningham (a long-term employee whose timecards showed the most unpaid pay of any of the plaintiffs). Exhibit 1 at ¶ 4(A)(1). Plaintiff Hackworth received the second-lowest amount, at $4,034.58 (again, based on the objective data contained on the timecards, as assessed by Plaintiff's counsel and Defendant's counsel). *Id.* Because Plaintiffs sought liquidated damages in this FLSA action as authorized under 29 U.S.C. § 216(b), the award to each Plaintiff from the $110,000.00 settlement amount is to be paid one-half on account of unpaid wages, and one-half on account of liquidated damages. Exhibit 1 at ¶ 4(A)(2).

In addition to the $110,000.00 to be paid to the employees for lost wages and liquidated damages, the agreement provided that Plaintiff Joshua Hackworth would separately receive a $10,000.00 named plaintiff award, Exhibit 1 at ¶ 4(B), and that Defendant would pay Plaintiff's counsel $55,000.00 for fees and reimbursement of advanced expenses, Exhibit 1 at ¶ 4(C). The total amount to be paid by Defendant was therefore $175,000.00, plus the mediator's fee and employer's share of taxes. Exhibit 1 at ¶ 4(D)

The settlement was subject to conditions. Exhibit 1 at ¶¶ 1-3. Specifically, it was subject to this Court's approval, which the parties now seek by this motion. Exhibit 1 at ¶ 3. Importantly, because Plaintiff and the opt-ins each asserted that they had state law claims for unpaid wages in addition to their FLSA claims, and because both Defendant and Plaintiffs wanted a global resolution of their dispute relating to unpaid wages, the settlement was also conditioned on every

one of the six opt-in Plaintiffs plus Plaintiff Hackworth personally signing a release in order to release his or her claims for unpaid wages against Defendant.  Exhibit 1 at ¶ 1[9]

Therefore, after the mediation, and after counsel negotiated and reached agreement on the more-detailed form of settlement agreement that is now Exhibit 1, counsel for Plaintiff spoke individually with each opt-in plaintiff.  Plaintiff's counsel explained the claims asserted, the settlement process, the settlement, and the conditions of the settlement.  Each plaintiff was provided with the agreement, which shows how the settlement is to be divided, including showing how much each opt-in plaintiff receives, Plaintiff Hackworth's $10,000.00 named plaintiff award, Plaintiff's counsel award of $55,000.00 for fees and expenses, and the fact that the settlement will not proceed if any one opt-in plaintiff chooses not to sign the settlement agreement.

Each Plaintiff signed the settlement agreement.  Exhibit 1.  Defendant and all of the Plaintiffs request that the Court approve the settlement.

## ANALYSIS

Parties may submit a proposed settlement of FLSA claims to the Court for approval. *See, e.g.*, *Ross v. Jack Rabbit Servs., LLC*, No. 3:14-CV-44-DJH, 2016 WL 7320890, at *2 (W.D. Ky. Dec. 15, 2016).  In deciding whether to approve a settlement, the Court must first determine whether there is a bona fide dispute over liability or coverage.  *Crawford v. Lexington-Fayette Urban Cty. Gov't*, No. CIV. A. 06-299-JBC, 2008 WL 4724499, at *1 (E.D. Ky. Oct. 23, 2008).  If there is such a dispute, the Court must then determine whether the settlement fairly and reasonably resolves that dispute.  *See id.*  The Court also may review the reasonableness of the fees sought by Plaintiff' counsel (i.e., that the settlement's terms relating to payment to Plaintiff's

---

[9]    The agreement was also subject to the approval of the board of Defendant.  Exhibit 1 at ¶ 2.  Defendant's board has approved the settlement.  Therefore, the only remaining contingency is this Court's approval of the settlement.

counsel are not unfair to the employees being represented by that counsel). Under the present circumstances, the parties' settlement should be approved on all of these accounts.

## I. There is a Bona Fide Dispute Between the Parties Regarding Whether Defendant is Liable At All, and, If So, in What Amount.

The purpose of the "bona fide" dispute requirement is to prevent employers from forcing employees to compromise their wage claims (i.e., accept in "settlement" less than they could recover through litigation) in circumstances where there is no actual dispute about whether the employee was owed overtime compensation. *See Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 709-710 (U.S. 1945) ("[t]o permit an employer to secure a release [of a 29 U.S.C. § 216(b) liquidated damages claim] from the worker who needs his wages promptly will tend to nullify the deterrent effect which Congress plainly intended that Section 216(b) should have"). This prevents the employer from "contracting around" the requirements of the FLSA. *Barrentive v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 740 (1981) ("FLSA rights cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate").

Here, the parties have a bona fide dispute. Plaintiff asserts he and the opt-in employees worked overtime for Defendant but were not paid overtime compensation. Ct. Doc. 1. Defendant, however, entirely denies that Plaintiffs worked any amounts at all for which they did not receive compensation, asserting that Plaintiff's focus on timecards is misplaced, and that employees recorded their time worked on a separate "timesheet" document. See Ct. Doc. 19. The parties have engaged in this contested civil action for more than a year and half.

Thus, the employer is not "contract[ing] around" the FLSA by entering into the settlement, and the concerns relevant to the "bona fide dispute" requirement (relating to "settlements" initiated by the employer as a ruse to pay employees less than the FLSA requires in the absence of a dispute

about liability) are simply not applicable. *Ritterbeck v. Akron Family Restaurant*, 2016 WL 6947018 at *1 (N.D. Ohio 2016) ("[i]n reviewing the settlement of a federal plaintiff's FLSA claims, the district court must '"ensure that the parties are not, via settlement of [the] claims, negotiating around the clear FLSA requirements of compensation for all hours worked, minimum wages, maximum hours, and overtime'… The existence of a bona fide dispute serves as a guarantee that the parties have not manipulated the settlement process to permit the employer to avoid its obligations under the FLSA"). Plaintiff and Defendant are certainly at arms-length, and have both dealt and will continue to deal blows to each other in this non-contrived, *bona fide* contested litigation if the Court does not approve the settlement.

## II. The Settlement Terms are Fair and Reasonable.

Accordingly, in light of the parties' dispute, the next step is to determine whether the parties' proposed resolution of the dispute is reasonable. Courts determine whether an FLSA settlement is reasonable by examining a number of factors. Specifically, courts consider (1) the risk of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the amount of discovery completed; (4) the likelihood of success on the merits; and (5) the public interest in settlement. *Ritterbeck v. Akron Family Restaurant*, 2016 WL 6947018 at *1 (N.D. Ohio 2016), citing *Crawford v. Lexington-Fayette Urban Cnty,* 2008 WL 4724499, at *3 (E.D. Ky. 2008), *itself citing Int'l Union, United Auto., Aerospace, and Agr. Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007).

Here, the factors weigh in favor of approval. First, there is no fraud or collusion. Absent evidence to the contrary, no fraud or collusion should be presumed to exist. *Ross*, 2016 WL 7320890, at *3. There is no such evidence in this case. To the contrary, the parties reached a settlement only after Plaintiff initiated litigation against Defendant, sought discovery in both this

Court and state court, and sought notice to current and former employees, and after the parties vigorously contested the validity of Plaintiff's claims and Defendant's defenses.

Further, the amount provided in the settlement reasonably compensates Plaintiff and the opt-in Plaintiffs for their claims asserted in this case. Even more specifically, both parties agree that, although Plaintiff articulated other claims relating to unpaid time associated with meetings and short lunches, the great bulk of the settlement value of Plaintiffs' claims (setting aside attorney's fees and expenses[10]) rested in Plaintiff's claims that the timecards showed time worked which Defendant did not pay.

Plaintiffs' and Defendant's analysis of the total amount that would be owed under Plaintiff's timecard theory for unpaid wages and liquidated damages differed. Defendant calculated a total amount owed under that theory to all seven plaintiffs from the earlier of the date two years prior to the time each plaintiff joined the action or June 1, 2019 (two years prior to the Court-selected June 1, 2021 tolling date). That total was $17,669.75.

Plaintiff, for Plaintiffs' part, performed their calculation over a longer period of time. Specifically, unpaid wages were calculated over a state-law statute of limitations period, while liquidated damages were calculated over the FLSA's longer three-year (not the two year period for non-willful violations used by Defendant) statute of limitations for willful violations. Plaintiffs' calculation was that the total amount Plaintiffs could recover for unpaid wages and liquidated damages under Plaintiffs' timecard theory of liability amounted to $126,968.17.

Of that amount, $44,590.75 would be recoverable under the FLSA, whereas $82,377.42 would be recoverable only under state law. However, recovering amounts under state law

---

[10] As discussed further below, since attorney's fees are awarded to any prevailing plaintiff under the FLSA, the amount of Plaintiff's attorney's fees and expenses was a substantial concern of Defendant.

presented serious challenges, including the lack of a statute providing employee a private right of action for unpaid wages, the Employee Manual's express disavowal of it itself constituting a contract, and the potential assertion of a shorter three-year statute of limitations period for unjust enrichment and/or conversion under T.C.A. § 28-3-105(2). Plaintiff's counsel has taken these state-law challenges into account both in assessing whether the settlement is in the plaintiffs' interests, as well as in the formula used to equitably divide the settlement amount amongst the plaintiffs (i.e., claims recoverable under the FLSA were weighted more heavily than claims recoverable only under state law).

The settlement, in addition to providing an aggregate amount to Plaintiffs justifying approval, also contains other aspects which support approval. In addition to paying for overtime compensation, the settlement further provides for Defendant must pay an amount on account of liquidated damages equal to the amount paid for unpaid wages. Defendant disputes that it would have been liable for liquidated damages, but recognizes that FLSA caselaw reflects that liquidated damages awards are the norm, and that the burden of establishing a "good faith" exception under 29 U.S.C. § 260 falls on the defendant/employer, not on the employee. *See Acosta v. CPS Food, Ltd.*, 2017 WL 5157238 (N.D. Ohio Nov. 3 2017) (burden to avoid liquidated damages rests on employer, and defendant failed to show it took affirmative steps to determine legality of its actions).

In summary, the settlement provides the plaintiffs with very substantial benefits on account of their FLSA claims, including substantially more than the plaintiffs could have recovered under the FLSA on the timecard theory, which was the primary theory advanced in this action. In light of this analysis, and based on Plaintiff's counsel's experience and review of the

litigation as a whole[11], Plaintiff's counsel has concluded that the settlement represents a fair compromise of Plaintiffs' position and a good result for Plaintiffs.  *See Barr v. Cleveland Metroparks*, No. 1:17-CV-1390, 2018 WL 692025, at *2 (N.D. Ohio Feb. 2, 2018) (approving settlement where it was "the result of arms-length negotiations between parties that were represented by able counsel").  Specifically, Plaintiff and Plaintiff's counsel concluded at the mediation, and the opt-in Plaintiffs have agreed thereafter, as evidenced by their execution of the agreement, that receiving $110,000.00 for claims Defendant contests (and which Defendant values, even if liability is assumed *arguendo,* at $17,669.75), is an excellent result.

The complexity, expense, and likely duration of the litigation also weigh in favor of approval.  *See Cooper v. Winking Lizard, Inc.*, No. 1:16CV1513, 2017 WL 4465759, at *3 (N.D. Ohio Oct. 4, 2017) (approving pre-certification settlement of FLSA claims in part because of "the factual and legal complexity of the case").  If the case were to proceed, Plaintiff and Defendant would have to litigate numerous issues, and would have to do so both in this action and the related state court action.  While such litigation could increase the amount of Plaintiffs' reasonable attorney's fees recoverable under the FLSA, Plaintiffs would still themselves only receive unpaid overtime compensation and liquidated damages and, as discussed above, Plaintiffs view the $110,000.00 to be recovered for unpaid overtime compensation and liquidated damages as an excellent result.

Further, the litigation has advanced to a point at which Plaintiffs would be required to make significant outlays of litigation-related expenses to proceed.  Specifically, but for the settlement, Plaintiff would ultimately need to advance expenses relating to depositions, which would include

---

[11] Plaintiff's counsel has thoroughly investigated the potential claims in this matter, including through extensive review of the documents, discussion with each plaintiff and several other witnesses, and legal research, and remains of the opinion that it is in the best interests of the plaintiffs that this settlement be approved, and requests that the Court approve the settlement.

depositions of members of Defendant's management and, depending on Defendant's litigation strategy, of plaintiffs and potentially other hourly employees.

And even if Plaintiff did prevail, the litigation would further delay Plaintiff' recovery. If the Court did not approve the settlement, and Plaintiff proceeded with this action until recovery, the inevitable delays associated with litigation (including potential appeal) would mean that actual payment to Plaintiff would likely be a year or two, or even longer, from now. The settlement, in contrast, provides for Plaintiff's prompt receipt of payment following Court. *See Cooper v. Winking Lizard, Inc.*, No. 1:16CV1513, 2017 WL 4465759, at *3 (N.D. Ohio Oct. 4, 2017) (approving settlement in part because "'the certainty and finality that comes with settlement also weighs in favor of' approving a fair and reasonable settlement"), quoting *Dillworth v. Case Farms Processing*, No. 5:08-cv-1694, 2010 WL 776933, at *6 (N.D. Ohio 2010).

Finally, the likelihood of success favors approval. Litigation is inherently risky, and the settlement provides the parties with certainty. Plaintiffs could theoretically receive more at trial, but it is also possible, or even likely, that they would receive less (including given all of the other various uncertainties of litigation, including the possibility of a jury accepting Defendant's management's "timesheet" testimony, despite Plaintiff's arguments relating thereto). On balance, the settlement returns a good result to Plaintiffs. Indeed, while it would be appropriate for this Court to approve this Settlement even if it could not predict which party would prevail at trial, *See Barr*, 2018 WL 692025, at *2 ("[w]hile the Court is not in a position to assess the likelihood of success on the merits, as the case was still in the early stages when settlement was reached, the Court finds that the other relevant factors weigh in favor of approving the settlement."), the award to Plaintiff of the amount proposed to be paid through the settlement is quite substantial, and supports approval of the settlement as reasonable.

**III Plaintiff' Counsel's Fee is Reasonable and Should Be Approved.**

Further, in an action under 29 U.S.C § 216(b), the award of attorney's fees, which is mandatory, *Ross*, 2016 WL 7320890, at *5, should be approved. The amount of those fees, however, is within the Court's discretion. *Id.* The fee must be determined to be reasonable – that is, that it does not excessively compensate counsel at the expense of the represented employees. *Id.* A reasonable fee is one that can attract competent counsel but does not produce windfalls. *Id.*

Here, the parties' settlement provides for payment to Plaintiff's counsel of $55,000.00, which effectively amounts to attorney's fees of $53,689.01 and reimbursement of advanced expenses in an amount of $1,310.99 (Plaintiff's expenses in this matter and the related state court matter[12] that is also the subject of this settlement are set forth in a detailed time and expense sheet, a copy of which is attached to the Declaration of Mark N. Foster, which is itself attached hereto as Exhibit 2). Accordingly, counsel is receiving an effective payment of 30.68 % of the recovery for fees (the after-expense fee amount of $53,689.01, divided by the total settlement payments of $175,000.00).

The contingency fee agreement between Plaintiff and Plaintiff's counsel provides that, upon a recovery, Plaintiff's counsel will be reimbursed for advanced expenses, and will also receive "the greater of" 40% of the total recovery or "the amount expressly awarded by a court or arbitrator as attorney's fees under any statute, contract provision, or legal theory allowing the

---

[12] The expenses shown on the statement total $1,635.49. However, this includes $324.50 advanced as the filing fee paid to file the Roane County Circuit Court matter. The settlement provides that Defendant is to pay the costs of the court in connection with the Roane County Circuit Court matter. Exhibit 1 at ¶ 6. This will result in the Roane County Circuit Court taxing the costs, which include the already-paid filing fee amount, to Defendant, and then refunding the filing fee to the payer (Plaintiff's counsel) after Defendant pays the Roane County Circuit Court costs. Because the agreement contemplates Plaintiff's counsel will retain this payment as reimbursement of advanced expenses, this amount is not also deducted from the $55,000.00 to be paid directly by Defendant to Plaintiff's counsel in calculating the effective fee stated in the text.

recovery of attorney's fees." Accordingly, Plaintiff's counsel is receiving less than the amount provided for in the contingency fee agreement.

"The Sixth Circuit has permitted fee awards ranging from 10 to 50 percent." see *In re: Amazon.com, Inc. Fulfillment Center Fair Labor Standards Act (FLSA) and Wage and Hour Litigation*, No. 228 in United States District Court for the Western District of Kentucky, No. 3:14-md-02504-DJH (2016), *citing Bowling v. Pfizer*, 102 F.3d 777, 780 (6th Cir. 1996). (affirming fee award of 10 percent of $102 million common fund); *Clevenger v. Dillards, Inc.*, No. C-1-02-558, 2007 U.S. Dist. LEXIS 174, at *10-11 (S.D. Ohio March 9, 2007) (finding 29 percent fee to be "modest and . . . below what is often awarded by district courts in th[e Sixth] Circuit" and citing various cases in support of that conclusion). Here, the award to Plaintiff' counsel of fees ($53,689.01) of approximately 30.68 % of the total settlement ($175,000.00) is appropriate and reasonable.

Further, the amount of counsel's fee is also reasonable, when assessed in light of a lodestar analysis. The parties request that the Court take judicial notice from the filings in this case that Plaintiff' counsel has expended substantial time, including in connection with a detailed complaint, seeking and obtaining both conditional certification and a favorable equitable estoppel ruling in connection therewith, propounding written discovery and opposing a stay associated therewith, initiating a state court action to be able to seek discovery relating to state law claims despite the then-unresolved status of conditional certification with respect to the federal claims, participating in informal/settlement discovery in advance of the mediation, extensively reviewing the relevant documents and preparing a detailed spreadsheet analysis, communicating with opt-in plaintiffs, travelling to Brentwood to attend mediation, and preparing the instant motion. [13]

---

[13] Of course, there will be a modest amount of additional work after submission of this motion in connection with ensuring the complete administration of the settlement, if approved.

Indeed, the detailed time sheet submitted herewith demonstrates that Plaintiff's counsel's fee, calculated on a lodestar basis without a multiplier, would amount to $75,317.50 (191.1 hours times $375.00 per hour, the reasonable rate Plaintiff's counsel seeks for his own time, [14] .4 hours of a then-graduating law student at a reasonable rate of $100.00 per hour, and 72.3 hours of Plaintiff's counsel's assistant's time at a reasonable rate of $50.00 per hour).

Finally, Plaintiff' counsel submits that, given that counsel took the representation on a contingency fee basis, which enabled the representation to proceed, a reasonable lodestar multiplier for the risk associated with this type of representation would be appropriate if there were not a settlement. *See In re: Amazon.com, Inc. Fulfillment Center Fair Labor Standards Act (FLSA) and Wage and Hour Litigation*, No. 228 in United States District Court for the Western District of Kentucky, No. 3:14-md-02504-DJH (2016) ("[a] multiplier above 1 is reasonable in a contingent-fee case, and 'most multipliers are in the relatively modest 1-2 range'"; approving award equivalent to 1.47 multiplier where lodestar analysis used as cross-check), *quoting Newberg on*

---

[14]     Defendant does not take a position on Plaintiff's counsel's hourly rate, but does ask the Court to approve the settlement. Plaintiff's counsel asserts that awarding his time at a rate of $375.00 per hour would be reasonable. *See Howard v. Ellis Moving and Storage, LLC*, 2022 WL 1005304 (M.D. Tenn. April 4, 2022) (noting that "recent opinions from within this district have approved hourly rates in FLSA disputes ranging from $250 to $475 per hour, with the most common rate approved being $350 per hour"). In addition to Plaintiff's counsel's declaration submitted herewith, a declaration of attorney Bernard Mazaheri, prepared in early 2019 in connection with another FLSA matter pending in the United States District Court for the Western District of Kentucky, supported an award of Plaintiff's counsel's time at the rate of $375.00 per hour. See Ct. Doc. 84-1 in *Rogers v. The Webstaurant Store, Inc.*, United States District Court for the Western District of Kentucky, No. 4:18-cv-00074. The dispute relating to the undersigned's hourly rate in *Rogers* was mooted by a subsequent settlement, which was approved after reference to the undersigned's requested rate. The United States District Court for the Western District of Kentucky later approved the undersigned's fees at $375.00 per hour in granting a default judgment against a defendant in a separate FLSA case. See Ct. Docs. 101-3, 106 in *Gerry v. Lin.*, No. 4:18-cv-10 (W.D.KY. 2020). In other cases, FLSA settlements have been approved based on motions, like the present one, filed other than under seal which sought approval of the reasonableness of the amount to be paid through the settlement for attorney's by providing a reference to the lodestar amount that would be awarded to the plaintiff based on undersigned Plaintiff's counsel's time at a rate of $375.00. *See, e.g.*, Ct. Docs. 66 and 67 in *Russo v. Moore Ingram Johnson & Steele, LLP*, United States District Court for the Middle District of Tennessee, No. 3:20-cv-820 (August 10, 2022); Ct. Docs. 18 and 19 in *Fletcher v. USA Global Logistics, LLC*, United States District Court for the Middle District of Tennessee, No. 3:20-cv-820 (September 21, 2021).

*Class Actions* § 15.87 (5th ed. 2016). The potentiality of a lodestar multiplier makes the award to Plaintiff's counsel actually sought to be approved that much more reasonable to Plaintiff – rather than demanding Plaintiff's proportionate share of the proceeds being paid by Defendant be reduced by having fees calculated on a lodestar and multiplier basis, Plaintiff's counsel has agreed, as a compromise and part of the settlement, to payment of 30.68 % of the settlement as fees.

In summary, if there were not a settlement, and Plaintiff proceeded and prevailed (which Defendant does not concede would be the appropriate result), Plaintiff would seek an appropriate award against Defendant for Plaintiff' counsel's fees for the work performed. Even based solely on the work to date, those fees would exceed the award to counsel of $53,689.01 in fees and $1,310.99 for reimbursement of advanced expenses provided for in the settlement (a total of $55,000.00), and approval of these fee amounts is reasonable and fair to Plaintiffs.

### IV.     The Named Plaintiff Award to Plaintiff Hackworth Should Be Approved.

Finally, the Court should approve the portion of the settlement providing for a named-plaintiff award to Plaintiff Joshua Hackworth of $10,000.00. Here, Mr. Hackworth "by lending his name to the litigation, … has, for the benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers." *Frank v. Eastman Kodak Co*., 228 F.R.D. 174, 187 (W.D.N.Y 2005) (approving $15,000 incentive payment to each of two named plaintiffs). Mr. Hackworth has also disproportionately been required to expend time and effort related to the litigation, as proposed class representative and as collective action representative. See Exhibit 2 at ¶ 10.

Under these circumstances, courts approve named plaintiff awards designed to fairly address the named plaintiff's role. *Frank, supra*, *see also, e.g., In re Janney Montgomery Scott LLC Fin. Consultant Litig.*, 2009 WL 2137224 at * 12 (E.D. Pa. 2009) (approving $20,000

enhancement award for named plaintiffs); *Bozak v. FedEx Ground Package Sys., Inc.*, 2014 WL 3778211 at * 4-5 (approving incentive award of $10,000 for named plaintiff and identifying cases awarding similar or higher amounts). Here, especially given that every opt-in plaintiff has reviewed and individually signed the agreement, which describes the amount and purpose of the named plaintiff award, see Exhibit 1 at ¶ 4(B) and Exhibit 2 at ¶ 9, the Court should approve the settlement.

## CONCLUSION

For all these reasons, the parties jointly move that the Court approve the parties' settlement.

Respectfully submitted:

/s/ Mark N. Foster
Mark N. Foster, BPR # 023626
Law Office of Mark N. Foster, PLLC
P.O. Box 869
Madisonville, KY 42431
(270) 213-1303
MFoster@MarkNFoster.com
*Counsel for Plaintiff*

/s/ Brian R. Bibb, with permission by Mark N. Foster
REID A. SPAULDING, BPR NO. 023363
BRIAN R. BIBB, BPR NO. 031024
WATSON, ROACH, BATSON
& LAUDERBACK, P.L.C.
P.O. Box 131
Knoxville, Tennessee 37901-0131
(865) 637-1700
*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the date indicated on the Court's CM/ECF system's Notice of Electronic Filing, a copy of this document was served on opposing counsel through the Court's CM/ECF system.

/s/ Mark N. Foster
Mark N. Foster